# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-22-00501-CV

## G. C., Appellant

### v.

## Texas Department of Family and Protective Services, Appellee

FROM THE 146TH DISTRICT COURT OF BELL COUNTY
NO. 317940, THE HONORABLE DALLAS SIMS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

G.C. (Father) appeals from the trial court's decree terminating his rights to his son Glen following a bench trial.[1] The trial court found that termination of Father's parental rights was in Glen's best interest and that Father knowingly placed or knowingly allowed Glen to remain in conditions or surroundings that endangered his physical or emotional well-being, engaged in conduct or knowingly placed Glen with persons who engaged in conduct that endangered his physical or emotional well-being, constructively abandoned Glen after he had been in the temporary managing conservatorship of the Department of Family and Protective Services (Department) for not less than six months, and failed to comply with the provisions of a court order that established the actions necessary to obtain the return of Glen. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (b)(2). On appeal, Father challenges the legal and

---

[1] To protect the child's privacy, we will refer to him by a pseudonym and will refer to family members by their relationships to him. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Although Mother's parental rights were also terminated, she is not a party to this appeal.

factual sufficiency of the evidence supporting the trial court's best-interest determination. We will affirm the trial court's termination decree.

## BACKGROUND

This case involves the termination of Father's rights to his son Glen, who was five years old at the time of the termination. However, the case initially started after the Department became concerned about Mother's parenting and her extensive history with the Department. Starting in 2014, the Department initiated several investigations of Mother for allegations of drug use and other criminal activity. In 2015, the Department investigated allegations that Mother was using methamphetamines and other drugs and learned that Mother left two of her other children in the custody of Father even though he was not the father of the children. During that investigation, Father tested positive for methamphetamines and admitted that he was using other illegal drugs while caring for the children. Ultimately, Mother's parental rights to those children were terminated.

The current case was initiated in June 2020 after the Department received a complaint that Mother was negligently supervising Glen and was using methamphetamines again. Later, the Department received a complaint alleging that Mother had committed fraud, stolen motor vehicles, and posted videos of her driving around in the stolen vehicles with Glen. Investigating police officers confirmed that some of the vehicles at Mother's residence were stolen and observed Mother driving Glen in stolen vehicles. After Mother was arrested, the Department tried to find a placement for Glen and learned that Father was incarcerated.

Although Father was in custody, the Department created a family service plan for Father setting out requirements with which he must comply to obtain the return of Glen with

2

many of the requirements to be completed after Father was released. Under the plan, Father was required to perform several tasks including the following: submit to a psychological evaluation; participate in individual counseling; undergo a drug assessment by Outreach, Screening, Assessment, and Referral (OSAR); submit to drug testing; obtain full-time employment; provide and maintain a safe home; not participate in any criminal activities; demonstrate an ability to meet Glen's basic needs and ensure his safety; participate in supervised visits with Glen; and complete therapeutic parenting classes.

The Department initially placed Glen in foster care and then placed him with fictive kin that Father recommended. Father was released in June 2021. Although Father was directed to have supervised visits with Glen, he also had unauthorized and unscheduled in-person visits with Glen at the fictive kin's home. For that reason, the Department again placed Glen in foster care where the child remained until trial.

After his release, Father enrolled in individual therapy, which he completed in December 2021. Father attended classes covering protective parenting. However, Father was re-arrested in February 2022 for aggravated assault with a deadly weapon and in March 2022 for unauthorized use of a motor vehicle, and he remained in custody through the trial in this case. According to the probable-cause statement for the February 2022 arrest, Father was involved in a vehicle collision while driving a U-Haul and left the scene. Father admitted to the investigating officer that he was looking for his girlfriend and a man and started following the man after seeing him driving, but he told the officer that he accidentally crashed into the man's vehicle. However, the man stated that Father pursued him at a high rate of speed and intentionally crashed into his car causing major damage. A witness saw the U-Haul fleeing the scene. According to the probable-cause statement for the March 2022 arrest, the police had been

3

notified that Father committed aggravated robbery and stole a truck. A police officer discovered the truck in an apartment complex parking lot and waited to see if anyone tried to use the truck. After the officer observed Father get into the truck and drive off, the officer initiated a traffic stop, identified Father as the driver, and discovered that Father possessed the owner's keys to the truck.

During the trial in July 2022, the following exhibits were admitted into evidence: Father's family service plan, the removal affidavit, and paperwork for Father's two arrests in 2022. At the start of trial, Mother conceded that termination of her parental rights was in Glen's best interest and that she failed to comply with the terms of a court order setting out the requirements for her to obtain the return of Glen, and she waived her right to appeal.

The Department's caseworker testified that she had been assigned to the case a few months before the trial, that her testimony was based on notes from her predecessors and affidavits, and that she had not yet met with Father. The caseworker discussed Father's recent arrests and discussed how he was in custody at the time of the trial. Although the caseworker acknowledged that Father had been discharged from individual therapy, attended protective parenting classes, and attended visits with Glen, she explained that Father's continuing criminal conduct shows that he had not sufficiently changed his behavior and that he did not comply with all of his service plan's requirements. Also, the caseworker related that Father had not made any child-support payments that had been reported to the Department, had not shown that he could provide for Glen's basic needs and safety, had not participated in visitation since being in custody, and had not obtained full-time employment. Further, the caseworker explained that although she did not know how long Father's punishments might last if he were found guilty of the charged offenses, Father could not provide a safe and stable home for Glen at the time of trial

4

because Father was in custody. The caseworker related that Father would show up for unannounced visits when Glen was placed with fictive kin and that during one of those visits, Father brought a gun. When describing those unannounced visits, the caseworker stated that Father "wasn't showing the Department . . . if he was sober" and "was putting [Glen] . . . in harm's way."

Regarding the Department's plans for Glen, the caseworker testified that the Department had performed a home study for Glen's aunt (Aunt) who was Father's sister and lived out of state, that the home study was approved, that Aunt wanted to adopt Glen, and that the Department intended to help facilitate Aunt's obtaining a license to adopt Glen. Further, the caseworker stated that Aunt had been having daily contact with Glen, that the visits between Aunt and Glen had been going well, and that Glen was excited to have the visits with Aunt and to meet his cousins. The caseworker explained that it was in Glen's best interest for Father's parental rights to be terminated and for Glen to be placed with Aunt.

Next, Aunt testified that she wanted to adopt Glen, that she wanted to provide Glen with stability by adopting him, that her preference was to be able to adopt Glen rather than serving as a custodian, that she and her husband were both employed, and that she could ensure that Glen had a stable home if she were allowed to adopt him. Regarding Father, Aunt explained that he had a criminal history and had been incarcerated at least three times and that she was concerned he could not stay out of trouble. Although Aunt stated that she would allow Glen to have contact with Father if that were legally permitted and that contact between them might be beneficial, she also testified that she worried that allowing Father access to Glen might delay Glen's feeling safe and stable in her care, that she would only be in favor of Father having

5

contact if he did not cause Glen mental distress, and that she would protect Glen from Father if that became necessary.

When the Department rested, Father testified that he was not aware that he was Glen's father until halfway through his previous time in custody, that he had never lived with Mother and Glen, that he took steps to address the abuse and neglect in Mother's home when he learned of it during this case, and that he was initially complying with his service plan after he was released from jail. Regarding his services, he stated that he attended individual therapy and was discharged, attended parenting classes, filled out paperwork for a psychological evaluation, submitted to multiple drug tests, did not use drugs, had visits with Glen, and maintained contact with Glen by phone. Father related that he sent child support to one of the placements. Additionally, Father testified that when he was first released from custody after this case began, he went to live at a recovery facility called the Recenter in Houston, Texas, for five weeks; did some services through the Recenter, including attending Alcoholics Anonymous and Narcotics Anonymous, anger management classes, and counseling; and worked while in Houston to pay for those services.

Although Father stated that he wanted to keep his parental rights and have a relationship with Glen, he also testified that he wanted Glen to be placed with Aunt, that it was in Glen's best interest to stay with Aunt, and that he wanted to pay Aunt child support when he was able. Father also agreed that he did not comply with the requirement that he not engage in criminal activity. Father explained that he applied for a job in Austin before being arrested again, but he related that he did not end up getting that job and that he slept on a relative's couch after leaving the Recenter. In addition, Father admitted that he "manipulated the situation" with the fictive kin placement to have unauthorized in-person visits with Glen but denied bringing a

6

gun to one of those visits. Regarding the new charges against him, Father stated that no trials had been held yet and that he did not know when he would be released.

Following Father's testimony, Glen's guardian ad litem stated that it was in Glen's best interest to have Father's parental rights terminated because termination would give Glen the best chance at having a permanent home and would allow Aunt to adopt him. The guardian ad litem also explained that even if Father's "life settles down" and Aunt at that point allows Father to have some type of relationship with Glen, Aunt should be fully in control of what type and amount of contact, if any, is warranted.

After considering the evidence, the trial court determined that termination of Father's parental rights was in Glen's best interest and that Father knowingly placed or allowed Glen to remain in conditions or surroundings endangering his physical or emotional well-being, engaged in conduct or knowingly placed Glen with individuals who engaged in conduct endangering his physical or emotional well-being, constructively abandoned Glen, and failed to comply with the provisions of a court order setting out the actions necessary for him to obtain the return of Glen. Accordingly, the trial court terminated Father's parental rights.

Father appeals the trial court's termination decree.

**STANDARD OF REVIEW AND GOVERNING LAW**

On appeal, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest determination. To terminate an individual's parental rights, the Department must prove by clear and convincing evidence that the parent engaged in conduct constituting at least one statutory ground for termination in the Family Code and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*,

7

434 S.W.3d 576, 580 (Tex. 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. When reviewing a termination order, appellate courts defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

In legal-sufficiency reviews, appellate courts consider undisputed evidence contrary to the finding at issue but assume that the factfinder resolved disputed facts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). The evidence is legally sufficient "if, viewing the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. In contrast, for factual-sufficiency reviews, appellate courts weigh the disputed evidence contrary to the finding against the evidence supporting the finding and ascertain "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

The best-interest determination "is child centered and focuses on the child's well-being, safety, and development." *Id.* It is guided by multiple non-exclusive factors, including the following: (1) the child's wishes; (2) the child's physical and emotional needs; (3) the physical and emotional danger to the child now and in the future; (4) the parental abilities of the people seeking custody; (5) programs available to help those people; (6) the plans for the

8

child by those people or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions indicating that the parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The Department need not prove all the factors, and the absence of evidence for some of the factors does not preclude a finding that termination is in the child's best interest. *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.). "While no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the child's best interest." *Id.* Evidence pertaining to a statutory ground for termination may also be probative of the best-interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

"When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *Id.* "Further, the amount of contact between the parent and child and the parent's failure to provide financial and emotional support, continuing criminal history, and past performance as a parent are all relevant in determining the child's best interest." *Id.*

**DISCUSSION**

On appeal, Father argues that the evidence was insufficient to support the trial court's best-interest determination. As support for this argument, Father notes that there was no testimony regarding Glen's desires for placement, that there was no evidence that Glen did not

9

want to see Father, and that the evidence presented showed that Father loved Glen. Relatedly, Father emphasizes that he had regular contact with Glen and attended in-person and virtual visits with Glen. Next, Father asserts that there was no evidence presented establishing that Glen had any needs that Father could not address. Further, Father emphasizes that he was successfully discharged from individual therapy, which included counseling on protective parenting. Additionally, Father referred to his testimony stating that he had no plans to disrupt Glen's placement with Aunt and that he wanted to pay Aunt child support. Moreover, Father notes that Aunt testified that she would not mind if Father retained his parental rights and had a relationship with Glen and that she would protect Glen from Father if that proved to be necessary. Finally, Father references the fact that Aunt had never met Glen in person and had not yet obtained a license authorizing her to adopt him.

However, evidence other than that on which Father relies was presented during the trial. Although Glen did not testify regarding his desires and although there was no testimony establishing that he had sufficient maturity to express his preference, *see In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (determining that desire-of-child factor was neutral where children did not testify at trial, where some children were too young to express preference, and where there was no evidence showing sufficient maturity of older children to express living preference), we do note that the caseworker testified that Aunt had daily contact with Glen, that Glen was excited to talk with Aunt, and that Glen was excited to meet his cousins.

Regarding Glen's emotional and physical needs and the emotional and physical danger to him, his basic needs include food, clothing, shelter, regular medical and dental care, a safe and nurturing home, and recreational activities and friendships appropriate to his age.

10

*See In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199, at *6 (Tex. App.—Fort Worth Sept. 8, 2016, no pet.) (mem. op.). Although Father testified that he paid child support to one of the placements and would like to pay Aunt child support, the Department caseworker explained that there was no record of any child support payments being made by Father. Moreover, Father testified that his attempt to find employment in Austin was unsuccessful, and he provided no testimony setting out how he would be able to provide a safe and nurturing home for Glen or otherwise contribute to paying for his basic needs. *Cf. In re J.L.G.*, No. 06-16-00087-CV, 2017 WL 1290895, at *6 (Tex. App.—Texarkana Apr. 6, 2017, no pet.) (mem. op.) (noting in best-interest analysis that parent discussed only vague plans to obtain employment and did not have plan to provide child with safe and stable home). Additionally, the removal affidavit stated that in a prior case involving some of Mother's other children, Mother placed her children in the custody of Father who tested positive for methamphetamines and admitted to using other illegal drugs while caring for those children. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting that parental drug use is relevant to best-interest determination).

Along those same lines, Father admitted that he was in custody when Glen was removed from Mother's care, did not comply with the requirement that he not commit any additional crimes while the case was ongoing, was in custody and had two charges pending against him, and did not know when he would be released. *See In re C.H.*, 89 S.W.3d at 28 (stating that parent's criminal history is relevant to best-interest finding); *In re J.G.*, No. 02-20-00038-CV, 2020 WL 3410503, at *7 (Tex. App.—Fort Worth May 28, 2020, no pet.) (mem. op.) (explaining that "[t]he trial court was free to measure Father's potential future conduct in providing for the emotional and physical needs of the children based on Father's past conduct"); *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3

11

(Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (emphasizing that "[a] parent's current and future incarceration is relevant to his ability to meet the child's present and future physical and emotional needs, and the parent's incarceration at the time of trial" renders his future uncertain); *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at \*6 (Tex. App.—Fort Worth Oct. 1, 2005, no pet.) (mem. op.) (commenting that "[w]hen parents are incarcerated, they are absent from the child's daily life and are unable to provide support" and that "when parents repeatedly engage in criminal conduct that subjects them to the possibility of jail time such acts can have a negative impact on a child's physical and emotional well-being"). Father's criminal history before and during this case, including a charge following removal for the offense of aggravated assault with a deadly weapon, "reveal that the existing relationship between Father and [Glen] is not a proper parent-child relationship." *See In re J.G.*, 2020 WL 3410503, at \*9; *see also S.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00123-CV, 2022 WL 2500337, at \*7 n.6 (Tex. App.—Austin July 7, 2022, no pet.) (mem. op.) (noting in best-interest analysis that parent was currently awaiting trial).

Although Father and the Department caseworker both testified that Father completed many of the services required of him, the caseworker explained that Father's continuing criminal conduct shows that he had not changed his behavior and that Father had not demonstrated the ability to provide for Glen's basic needs and safety, had not obtained full-time employment, and could not currently act in Glen's best interest. *Cf. In re J.L.G.*, 2017 WL 1290895, at \*5 (emphasizing that parent "remains[] incarcerated" "[b]ecause of her actions, both before and during the pendency of this case" and reasoning that trial court could have reasonably placed more weight on her conduct that led to her continued incarceration rather than her claim that she had changed and "conclude[d] that [the parent] would not be able to meet the

12

physical and emotional needs of her children"). Further, although Father denied bringing a gun, the Department caseworker testified that Father went to the home of the fictive kin placement to have unannounced and unsupervised visits with Glen and brought a gun with him during one of those visits. *See In re A.B.*, 437 S.W.3d at 503 (noting that appellate courts defer to factfinder who is sole arbiter of credibility of witnesses). Moreover, Father admitted that he arranged to have unauthorized visits with Glen when he was placed with fictive kin.

On the other hand, Aunt explained that she wanted to adopt Glen and move him into her home with her children and that she and her husband were both employed. The Department caseworker testified that Aunt's home study was approved and that it was in Glen's best interest for him to be placed with her and for Father's rights to be terminated. Glen's guardian ad litem also stated that it was in Glen's best interest for Father's parental rights to be terminated and for Glen to be adopted by Aunt and that termination of Father's rights provided the best option for Glen to be placed in a permanent home. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied) (noting that "[t]he need for permanence is a compelling consideration in determining the child's present and future physical and emotional needs"), *superseded by statute on other grounds as stated in In re S.N.Z.*, 421 S.W.3d 899, 909 n.4 (Tex. App.—Dallas 2014, pet. denied). Similarly, Father testified that it was in Glen's best interest for him to be placed with Aunt and that he wanted Glen placed with Aunt. *Cf. In re J.L.G.*, 2017 WL 1290895, at *6 (commenting in best-interest analysis that parent agreed that child should remain with placement while she was in jail).

Regarding future plans of the individuals seeking custody of Glen, the Department caseworker explained that the Department intended to help facilitate Glen's adoption by Aunt. Similarly, although Aunt said that she would allow Father to have limited contact with

Glen if that was ordered by the trial court and that it might be beneficial provided that it did not cause Glen any distress, she also stated her preference that she be allowed to adopt Glen in order to ensure that he has a safe home. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 695 (Tex. App.—San Antonio 2017, pet. denied) (observing that "establishing a stable, permanent home for a child is a compelling interest for the government") (quotation omitted); *see also D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ) (observing that best-interest determination may consider whether termination would allow adoption to occur), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 & n.39 (Tex. 2002).

Although he testified that he wanted to retain his parental rights and to have a relationship with Glen, Father failed to provide any further description of his plans for Glen. *See In re J.G.*, 2020 WL 3410503, at \*9 (stating that "[t]he trial court was entitled to compare Father's lack of plans to the Department's plan in considering the best interests of the children"); *In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that "[t]he fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party are realistic or weak and ill-defined").

Viewing all the evidence in the light most favorable to the trial court's decree, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights is in Glen's best interest. After weighing the disputed evidence that is contrary to the best-interest finding against the evidence supporting the best-interest finding, we conclude that the disputed evidence is not so significant that a reasonable factfinder could not have resolved it in favor of the finding. Accordingly, after considering the relevant factors under the appropriate standards of review, we conclude that the evidence is

14

legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in Glen's best interest.

For these reasons, we overrule Father's issue on appeal.

## CONCLUSION

Having overruled Father's issue on appeal, we affirm the trial court's termination decree.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed:   November 30, 2022

15